IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00230-JLK

Beth M. Fritz,

      Plaintiff/Appellant,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

      Defendant/Appellee.

_____

MEMORANDUM DECISION ON APPEAL
_____

Kane, J.

      Plaintiff-Appellant Beth Fritz appeals the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  Ms. Fritz claims she has been unable to work since April 2009, due to severe arthritis in her back with bone spurs, bipolar mood disorder, cognitive disorder, anxiety, chronic obstructive pulmonary disease, and leg and foot pain.  Her impairments resulted in her being homeless for several years, and it is only through the financial support of her Uncle, John Staunton who is himself receiving disability benefits, that Ms. Fritz has a place to live and has been able to pursue some treatment for her conditions.  The Commissioner initially denied her application in 2011, and since then, Ms. Fritz has endured an additional five years of litigation regarding her claim.

      Ms. Fritz now challenges the ALJ's decision, arguing she erred by improperly determining Ms. Fritz's residual functional capacity (RFC) and by failing to meet the Commissioner's burden of production, and proof, that Ms. Fritz had the capacity to work in

positions that exist in significant numbers in the national economy.  For the reasons stated below, I REVERSE,[1] and REMAND the case to the Commissioner for an immediate award of benefits.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on September 22, 2009, asserting a disability onset date of April 17, 2009, due to arthritis in her back with bone spurs, bipolar disorder, manic depression, COPD, and leg and foot pain.  (R. 255.)  As with the majority of all initial disability applicants, Ms. Fritz's initial claim was denied.

After an initial hearing held in February 2011, Administrative Law Judge (ALJ) William Musseman rejected Ms. Fritz's disability claim at step four of the five-step sequential evaluation.[2] In May of 2012, the Appeals Council remanded the case to the ALJ for a new hearing and decision. After a second hearing held in September 2012, the ALJ again denied Ms. Fritz's disability claim at step five.  In February 2013, the Appeals Council denied review of Ms. Fritz's claim, and thus the ALJ's second decision became the final decision subject to judicial review.  In May 2013, Ms. Fritz sought review by this Court, but before briefing was complete the Commissioner moved for a Sentence 4 remand back to the agency, which motion was

---

[1] Ms. Fritz's appeal was filed in this court in February 2015 and assigned to the appellate docket. It was reassigned for merits review to another judge on August 26, 2015.  Due to the press of court business, the case was reassigned to me on August 4, 2016. I heard oral argument on this case and several others on October 21, 2016.

[2] At **step one**, the ALJ must determine whether a claimant presently is engaged in a substantially gainful activity. *Wall v. Astrue,* 561 F.3d 1048, 1052 (10th Cir.2009).  If not, the ALJ then decides at **step two** whether the claimant has a medically "severe" impairment.  *Id.*  If so, at **step three**, the ALJ determines whether the impairment is "equivalent to a condition 'listed in the appendix of the relevant disability regulation.'"  *Id.* (quoting *Allen v. Barnhart,* 357 F.3d 1140, 1142 (10th Cir.2004)).  Absent a match in the listings, the ALJ at **step four** decides whether the claimant's impairment prevents him from performing his past relevant work.  *Id.*  If so, the ALJ proceeds to **step five** and determines whether the claimant has the RFC to "perform other work in the national economy."  *Id. See Allman v. Colvin*, 813 F3d 1326, 1329 n.1 (10th Cir. 2016).

granted. After a third hearing in May 2013 before a new ALJ, Kathryn D. Burgchardt, Ms.

Fritz's disability claim was again denied at step five.

*Ms. Fritz's Personal History*

Ms. Fritz is a 53 year-old woman living in Colorado Springs, Colorado.  In 2006,

homeless and alone, she moved from Reno, Nevada to Colorado Springs to live with her uncle,

and she has not been employed since.  (R. 255, 466.)  Ms. Fritz reports that her stepfather began

sexually and physically abusing her at age six.  (R. 366.)  The lower back injury that forms part

of her claimed disability was the result of her stepfather assaulting her and stomping on her back

after knocking her down when she was fifteen.  (*Id*.)  She was first diagnosed with "manic

depression" in 1996, COPD in 2008, and lumbar arthritis in 2008.  (R. 368, Def.'s Br. 3).  Ms.

Fritz's family has an extensive history of bipolar disorder and alcohol abuse.  (R. 292.)   She

started drinking alcohol at the age of fourteen, used marijuana from age seventeen to twenty,

illicit prescription drugs from age thirty-three to forty, and various streets drugs, including

heroin, from age forty-one to forty-three.  (R. 368.)  Ms. Fritz last used heroin in July 2006 and

has received methadone treatment since then.  (*See e.g.* R. 368, 657-58.)  Since 2008, Ms. Fritz

has received treatment from at least six mental and three physical health providers, she has

received two physical and three psychological consultative examinations, and one state agency

psychology consultant reviewed her medical records.  In this time, Ms. Fritz has received

treatment for myriad symptoms and diagnosed impairments, including mood disorder, poly-

substance dependence, chronic back pain, foot and leg pain, COPD, anxiety disorder, cervical

stenosis with thoracic outlet syndrome, panic disorder with agoraphobia, trichotillomania,

depression, chronic constipation, and Raynaud's disease.

*The Tortuous Path of Ms. Fritz's Disability Claim*

Ms. Fritz's original DIS and SSI claims were premised on allegations of disability beginning in April 2009 due to arthritis in her back with bone spurs, bipolar disorder, manic depression, COPD, and leg and foot pain. (R. 255.) The SSA Regional Commissioner denied her applications in 2010, and then they were denied by an ALJ in 2011. (R. 116-19, 95-104). In May 2012, the Appeals Council remanded the case to the ALJ for a new hearing and decision. (R. 110-12)(finding the ALJ had failed to consider medical evidence showing Ms. Fritz may have a mental impairment; did not explain why limitations on Ms. Fritz's use of her right shoulder were not included in her residual functional capacity (RFC) assessment; and included a job class that was never mentioned by the vocational expert in his decision that exceeded Ms. Fritz's stated RFC). In September 2012, the ALJ held a second hearing, again finding Ms. Fritz was not disabled. (R. 35-59; R. 9-20). This decision became final when the Appeals Council denied review. (R. 1-4).

In May 2013, Ms. Fritz sought judicial review by this Court. (R. 519-20). The Commissioner voluntarily moved to remand the case for further administrative proceedings, stating the Appeals Council "would direct the ALJ to further evaluate the medical opinions of record—including the opinions of Dr. Wanstrath and Dr. Benson regarding social limitations— and provide legally valid reasons for discounting any opinion or portion of an opinion that is not adopted." (R. 526.) In addition, Fritz's RFC would be reassessed and additional vocational expert testimony obtained if necessary.  (*Id.*) In light of this motion, I reversed the Commissioner's prior decision, and remanded the case to the Commissioner for further administrative proceedings consistent with the Commissioner's motion. (R. 522-23.) On remand, a new ALJ held a hearing in August 2014, and this ALJ found Ms. Fritz not disabled from her

alleged onset of disability through the date of the decision, November 6, 2014.  (R. 436-50.)
This third ALJ decision became the final decision of the Commissioner and is the one before me
now for review.  Jurisdiction exists under 42 U.S.C. § 405(g).

*Ms. Fritz's Medical and Treatment History*

Before filing her application, Ms. Fritz was treated at Peak Vista Community Health
Centers (Peak Vista) from April 2007 to July 2008. (R. 341-65.)  On April 7, 2008, Kipton G.
Freer, D.O., diagnosed Fritz with mood disorder, poly-substance dependence in remission, and
chronic back pain and spinal problems, and assigned her a Global Assessment of Functioning
(GAF) score of 50-55.[3]  (R. 356.)  During this visit, Ms. Fritz reported her prescribed Lithium
medication as being "too sedating" and the prescribed dosage put her to sleep.  (*Id.*)  Dr. Freer, a
psychiatrist, reported that Ms. Fritz struggled to provide a coherent mood and sleep history, and
he recommended continuing to monitor her depressive and anxious symptoms.  (*Id.*)  Dr. Freer
noted that prior drug abuse can make the diagnosis of bipolar disorder difficult, as symptoms of
the disorder are hard to differentiate from the effect of abused substances.  (*Id.*)  On April 21,
2008, Dr. Freer conducted a follow-up consultation with Ms. Fritz.  (R. 355.)  During this visit,
Dr. Freer performed a mental status exam on Ms. Fritz, finding that her mood was "sad," affect
was "constricted," behavior "excessive," thought processing was "tangential and
circumferential," thought content was not "overt delusion and [she] denied recent or current
[suicidal thoughts], and her speech was not "pressure[d]."  (*Id.*)  Dr. Freer assigned Ms. Fritz a
GAF score of 55-60.  (*Id.*)  He recommended that she discontinue taking Lithium, prescribed her
Zoloft to treat her "multiple symptoms of depressed mood," continue therapy, and schedule
follow-up consultations. (*Id.*).  On July 16, 2008, Karen Campbell, D.O, treated Ms. Fritz. (R.

---

[3] A GAF score between 51-60 indicates moderate symptoms or moderate difficulty in social,
occupational, or school functioning.

344-47.)  During this consultation, Ms. Fritz reported that she did not like the Zoloft medication, as it made her feel manic and on "speed."  (R. 344.)  Dr. Campbell noted that she consulted with Dr. Freer, who is reported to have doubted Ms. Fritz's diagnosis of bipolar disorder.  (R. 346.) Dr. Campbell recommended Ms. Fritz have additional laboratory work performed, and seek follow-up treatment from another mental health provider, Dr. Kron, who specializes in the treatment of patients with histories of substance addiction.  (*Id*., 342).  Dr. Campbell also resumed Ms. Fritz's prescription for Lithium and discontinued her treatment with Zoloft.  (R. 347.)  In the Clinical Summary for Peak Vista, Dr. Campbell retained the diagnosis of depression and bipolar disorder after her July 16 encounter with Ms. Fritz.  (R. 342.)

Pursuant to Ms. Fritz's attempt to receive vocational services from the Colorado Department of Human Services' Division of Vocational Rehabilitation, her vocational counselor, Andrew Winters, directed she receive psychological and physical consultative examinations.  (R. 313, 333-34.)  David Benson, Ph.D., and Teresa Anderson, M.A, performed the psychological examination on October 14, 2008.  (R. 313-25.)  These professional evaluators compiled a report that provides Ms. Fritz's detailed medical and psychological history, and then proceeded to delineate the results of a wide-range of intelligence, personal, vocational, mental health, and substance abuse assessments used in her evaluation.  (*Id.*)  Ms. Fritz's full scale test score on the Wechsler Adult Intelligence Scale-Third Edition showed that she was in the "low average range of intellectual functioning."  (R. 317).  These examiners summarized their findings from this testing that Ms. Fritz

> Has problems with abstract reasoning and a low vocabulary.  She also has poor common sense reasoning.  She has marked deficits in the performance area, compared to her verbal abilities.  Therefore, she would be best suited for tasks that emphasize verbal abilities.  She has low visual motor speed and poor attention to detail and lower abstract visual perceptual reasoning.  Overall, her

performance ability falls at a level that would cause her a significant problem in lines of work where there was a strong emphasis on performance-related skills.

(R. 322). Dr. Benson and Ms. Anderson also performed a wide range achievement test

(WRAT3) on Ms. Fritz—finding her scores indicated Ms. Fritz could compete at the community

college or trade school level, but probably not above that level. (R. 323.)   The evaluators

summarized their evaluation as showing that Ms. Fritz

> hasa combination of emotional and characterological problems, as well as some mood problems which will be a barrier to her participation in the work world. These characteristics will result in various ongoing difficulties . . . She will have rapid mood changes and ongoing difficulties with anxiety, including a panic disorder and obsessive/compulsive characteristics . . . Ms. Fritz will be overwhelmed by stress and she tends to respond to stress with increased physical problems . . . She may have poor or erratic performance and be abrasive. She will appear to lack consideration for others and will tend to complain about many things . . . She has strong social anxiety and is prone to having panic attacks in certain social situations . . . Other problems include the fact that Ms. Fritz has difficulty with attention, concentration, and focus and has a poor memory. She has difficulty sleeping and is often fatigue [sic] . . . With these problems together, she will face multiple barriers to effective participation in the work world.

(R. 323-24.) Dr. Benson and Ms. Anderson diagnosed Ms. Fritz with bipolar disorder, anxiety

disorder, panic disorder with agoraphobia, and poly-substance dependence. (R. 325.)   The

evaluators recommended a situational assessment of Ms. Fritz, as well as ongoing mental health

treatment of her diagnosed conditions. (*Id*.) In regard to Ms. Fritz's vocational placement, Dr.

Benson and Ms. Anderson recommended that

> [t]he best choice for her will be a verbally oriented position in a well-structured job where she doesn't have to deal in an unpredictable manner with the general public. She should work mostly along or with individuals with whom she is comfortable and willing to work with her. She is likely to have problems on the job, both interpersonally and emotionally.

(R. 325.)

Then, pursuant to her state vocational counselors request, Gregory Finnoff, D.O.,

performed a consultative physical exam of Ms. Fritz on October 25, 2008.  (R. 326-36.)  Ms.

Fritz reported her chief complaints as chronic back pain, bipolar disorder, and COPD. (R. 326.)

Dr. Finnoff, performed a physical exam, including: taking vital signs; testing coordination,

station, and gait, as well as range of motion; and performing spine and neurological exams. (R.

328-31.) Dr. Finnoff was not provided any medical records prior to his examination of Ms. Fritz,

but still diagnosed her with "chronic back painsyndrome"[4] (noting that exam findings were

"consistent with musculoskeletal back pain"), bipolar disorder, and COPD. (R. 331.) He also

noted that a lumbar radiograph was consistent with Ms. Fritz's claimed symptoms and the

examination finding that she had "moderate narrowing plus sclerosis and a grade ½

spondylolisthesis at the L3-4 level [and a] large amount of anterior and lateral spur formation [at]

that level, [giving the impression of m]oderate to severe degenerative changes at the [same

level]." (*Id*.) As relevant here, Dr. Finnoff concluded in his functional assessment of Ms. Fritz

that "[he] would anticipate that she would be able to tolerate normal level of complexity and

stress in a workplace environment. She would be able to tolerate frequent sitting, standing,

walking, continuous, lifting 10 pounds frequently, lifting up to 25 occasionally, lifting up to 50,

never." (*Id*.)

 In February 2009, Ms. Fritz received at least three individual therapy sessions at Pikes

Peak Mental Health. (R. 643-44.) In a summary of the treatment provided, Sharon Allen, M.A.,

noted that Ms. Fritz reported a mostly stable mood but she "freaks out" if she watches the news,

gets very anxious and angry, has problems with concentration, and has feelings of inappropriate

guilt and anxiety. (R. 643.)

---

[4] Drs. Finnoff and Lester both use the phrase "chronic back painsyndrome." I have been unable to find a qualitative difference in medical literature between "painsyndrome" and "pain syndrome," although the latter is far more common. Yet I have retained the Drs. spelling choice as they are the medical experts, not me.

In 2010, Ms. Fritz underwent additional psychological and physical consultative examinations. On March 22, 2010, Sandra W. Lester, PsyD., a licensed clinical psychologist, examined Ms. Fritz. (R. 366-72.) Dr. Lester reviewed Dr. Finnoff's medical report, provided a detailed medical and personal history, and performed a mental status exam. (R. 366-71.) Dr. Lester diagnosed Ms. Fritz with bipolar disorder (with most recent episode "manic, severe, with psychotic features"), opioid dependence, trichotillomania, anxiety disorder, chronic back painsyndrome and COPD, and assigned her a GAF of 50. (R. 371-72.) Dr. Lester stated that Ms. Fritz's mental impairments appeared to be "chronic and severe," and found her symptoms to be consistent with her previous diagnoses. (R. 372.) Dr. Lester concluded that her

> clinical impressions of Ms. Fritz are that she is depressed, and is experiencing marked distress due to her physical limitations and her mental health conditions . . . Her ability to attend to tasks and concentrate is impaired. Her ability to make good decisions and judgments are likely subject to her state of decompensation from her mental health conditions. She would most likely have difficulties in structured environments that require demands on her. She may be able to do simple jobs or menial tasks and follow simple instructions if such jobs are not physically demanding, and providing that her mental health conditions are properly treated. At this time she would be unable to sustain the demands of a normal work day in terms of physical endurance, and the mental capacity to concentrate and attend to work place tasks.

(R. 372.)

On March 27, 2010, Edwin Baca, M.D., completed a physical consultative exam of Ms. Fritz. (R. 373-78.) Similar to the procedure followed by Dr. Finnoff, Dr. Baca performed a physical exam, including: taking vital signs; testing coordination, station, and gait, as well as range of motion; and performing spine and neurological exams. (R. 375-77.) Dr. Baca diagnosed Ms. Fritz with depression, COPD (supported by spirometry testing), bipolar disorder, multiple pneumonias in the past, past opioid and heroin addiction, chronic lower back pain, chronic bilateral lower extremity pain and weakness secondary to back pain, and bilateral temporomandibular joint pain (TMJ). (R. 378.) In his functional assessment of Ms. Fritz, Dr.

Baca "strongly recommend[ed]" that she continue seeing a psychiatrist and establish care with a primary care physician for further evaluation and continued treatment "for her current medical conditions as well as chronic lower back pain." (*Id.*)  Dr. Baca also found that Fritz could stand or walk, as well as sit, for four to six hours per an eight-hour workday, but found that "[p]ostural limitations recommended at this time are no bending, stooping, crouching greater than five times an hour or as tolerated by the patient." (*Id.*) Dr. Baca also added the functional limitation that Ms. Fritz "should not have repetitive motion overhead, especially with her right upper extremity and should . . . not lift a weight load overhead greater than five pounds." (*Id.*)

On April 13, 2010, state agency psychology consultant James J. Wanstrath, Psy.D., reviewed the record of Ms. Fritz's DIB and SSI applications, and made identical findings on both claims. (R. 69-70, 84-85.)  Dr. Wanstrath concluded that Ms. Fritz has understanding and memory limitations, as her ability to understand, and to remember detailed instructions, was "moderately limited."  Next, she has sustained concentration and persistence limitations, as her ability to carry out detailed instructions, to maintain attention and to concentrate for extended periods, and to complete normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace with an unreasonable number and length of rest periods, were all "moderately limited." (R. 69-70, 84-85.) Additionally, Dr. Wanstrath found that Ms. Fritz has social interaction limitations, as her ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworker or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, were all "moderately limited." (R. 70, 85.)  Dr.

Wanstrath provided his ultimate opinion of Ms. Fritz's Mental Residual Functional Capacity in narrative form, concluding that

> [i]f claimant stays on her meds—she retains mental ability to do work not involving significant complexity or judgment; [she] can do work requiring up to 3 month time to learn techniques, acquire information and develop facility needed for an average job performance; [she has] moderate restrictions #18 and minimal interaction with [general public] and cannot work closely with supervisors or coworkers; [she] can accept supervision and relate to coworkers if contact is not frequent or prolonged[.]

(*Id.*)

From May 2011 to July of 2012, Ms. Fritz received treatment at Open Bible Medical Clinic. (R. 403-23.) The Clinic provided no report or conclusion regarding Ms. Fritz's impairments and potential limitations. (*Id.*) Initially, Ms. Fritz sought treatment at the Clinic for "menstrual irregularities/weakness," during which time her provider noted that her "perceptions [were] distorted." (R. 423.) In addition to Lithium, the Clinic prescribed her Flexeril, a drug used to treat skeletal muscle pain. (R. 420, 416, 414, 412, 410, 409, 406.) Laboratory analysis of her blood revealed that Ms. Fritz's Lithium level was lower than the typical therapeutic level (R. 421.), although later results showed an increase (R. 418.), and finally being described as a "borderline low" level (R. 415.). In February 2012, she also reported increased anxiety since she was started on a thyroid medication (Levothyroxine). (*Id.*) On June 5, 2012, her provider noted under his assessment and plan "bipolar—stable." (R. 408.)

From August 2011, to at least August 2014, Ms. Fritz received mental health treatment at Franciscan Community Counseling from Sharon K. Compono, LCSW. (R. 675-723.) Ms. Compono had 51 individual counseling sessions with Fritz on a weekly basis from August 16, 2011 to September 12, 2012. (R. 431.) LCSW Compono authored two reports summarizing the treatment and mental condition of Ms. Fritz, the first on September 13, 2012, and the second on

August 28, 2014.  (R. 430-32; R. 675-77.)  In 2012, Ms. Compono diagnosed Ms. Fritz with

bipolar disorder (most recent episode manic, severe, with psychotic features), anxiety disorder,

poly-substance dependence (sustained remission), trichotillomania, chronic back pain, arthritis,

ovarian cyst, urinary problems, constipation, and hypothyroidism.  (R. 432.)  In her 2012 report,

Ms. Compono concluded

> the severity and number of Ms. Fritz' symptoms compromise her daily
> functioning socially, emotionally, and occupationally [and thus] there is serious
> concern over her ability to maintain employment over any period of time.  Based
> upon [Ms. Compono's] clinical impression, there is little likelihood Ms. Fritz
> could sustain employment at this time or in the next 12 months."

(*Id.*)  After filing this first report, Ms. Compono continued to counsel Ms. Fritz on a weekly

basis, approximately, through the time she submitted her second report in August 2014.  (R. 675-

77.).  In this 2014 report, Ms. Compono offered new clinical observations that "[Ms. Fritz] is

often distracted and unfocused, with racing thoughts.  At times, her thought processes are

irrational."  (R. 675.)  Ms. Compono updated Ms. Fritz's diagnosis to bipolar disorder (most

recent episode, manic, *moderate* with psychotic features), and added the diagnoses of delusional

disorder (persecutory type) and ADHD.  (R. 677.)  Ms. Compono also noted "Ms. Fritz does

function in day-to-day living, but in my professional opinion, [she] would not be able to function

in a work environment."  (*Id.*)  Both reports consistently reference that Ms. Fritz stated she could

not continue to work as a waitress because her physical pain and mental health impairments, that

she regularly feels "uneasy and unsettled," and she is "very uncomfortable being around other

people."  (R. 431.)  In 2012, Ms. Compono assigned Ms. Fritz a GAF score of 50, and in 2014, a

score of 55.  (R. 677, 432.)

During her counseling with Ms. Compono, Ms. Fritz also sought treatment at Colorado

Springs Health Partners (CSHP) from November 2013 through September 2014.  (R. 758-807.)

Ms. Fritz sought care at CSHP as she was "having problems holding or grabbing with [right] hand and arm." (R. 759.) During her first visit to CSHP on November 25, 2013, Anna Kraus, D.O., assessed Ms. Fritz and found she had right-limb weakness (paresis), thoracic outlet syndrome, and bipolar disorder. (*Id*.) Dr. Krauss developed an additional treatment plan for Ms. Fritz's hypothyroidism, Raynaud's disease, limb weakness (paresis), and thoracic outlet syndrome. In December 2013 Pio Hacate, M.D., a radiologist, analyzed Ms. Fritz's MRI— finding that she had "[m]ultilevel degenerative spondyloarthropthy [(a joint disease of the vertebral column)] most significant for causing moderate to severe narrowing [(stenosis)] of the right C5-C6 neuroforamen [a passage in the spine through which nerve roots exit]." (R. 763.) In September 2014, Michael Starkey, M.D., also a radiologist, analyzed Ms. Fritz's lumbar-specific MRI, and concluded that Ms. Fritz had "L3-L4 spondyloarthrosis with moderate to severe right and moderate left neural foraminal stenosis." (R. 803.) Ms. Fritz was initially placed on weekly physical therapy plan to last six weeks (R. 753), and she received such treatment from December 2013 through April 2014, when she was discharged for a failure to schedule a follow-up appointment (R. 753, 756).

Last, Ms. Fritz began treatment at Aspen Point in January 2014. (R. 638-74.) During her initial visit, Ms. Fritz complained of problems with depression, muscle pain and weakness, anxiety and panic attacks, COPD, low-self esteem, memory issues, and problems sleeping. (R. 638.) From January 2014 through at least August 2014, Ms. Fritz attended individual and group therapy sessions, and she developed four successive individualized treatment plans with her mental health providers at Aspen Point. (R. 648-55.) On April 23, 2014, Rachel Wilkenson, M.D., examined and performed a psychiatric mental status exam, notably finding that Ms. Fritz's affect was anxious, speech was loud and somewhat pressured, attention/concentration was

"fair—markedly distractible, but able to be redirected," and had some word-finding problems. (R. 659.) Dr. Wilkenson diagnosed Ms. Fritz with bipolar disorder (unstable), anxiety disorder, cognitive disorder (unstable), polysubstance dependence, nicotine dependence, chronic constipation, and Raynaud's disease. (*Id.*) Dr. Wilkenson assigned Ms. Fritz a GAF score of 50, and proscribed Lamictal for her bipolar disorder. (*Id.*) On May 22, 2014, Dr. Wilkenson completed a second consultation, including another psychiatric mental status exam, notable changes included that Ms. Fritz's mood was anxious but positive, and her "affect [was] intense." (R. 664.) Dr. Wilkenson updated Mrs. Fritz's diagnoses to bipolar disorder (unstable but not severe) and added chronic pain. (*Id.*) During this visit, Ms. Fritz and Dr. Wilkenson agreed to increase her Lamictal prescription. (*Id.*) On July 10, 2014, Dr. Wilkenson again evaluated Ms. Fritz, and during this visit Ms. Fritz reported that she was feeling more depressed, had been crying for no reason, and experienced an increase in her morbid thoughts since their last appointment. (R. 667.) Dr. Wilkenson and Ms. Fritz discussed options, and mutually decided to try a low-dosage of Wellbutrin, a medication typically used to treat major depressive order. (*Id.*) Ms. Fritz also reported having a breakout of a cold sore in her mouth when she increased her Lamictal daily intake (a medication known to cause rashes), and so had gone back to a lower dosage. (*Id.*) Dr. Wilkenson performed another mental status examination, notably finding changes that Ms. Fritz's mood was depressed and she felt totally overwhelmed, affect was less intense than before, speech was not as loud or intense, and attention/concentration was "fair— less distractible today." (R. 669.)

*The Third (and operative) ALJ Decision*

In a written decision dated November 6, 2014 (R. 436-50), ALJ Burgchardt determined at step two of the sequential analysis Ms. Fritz had the following impairments–degenerative disc

14

disease of the lumbar spine, cervical stenosis with thoracic outlet syndrome, mood disorder,

cognitive disorder, and anxiety disorder—and that each of these met the regulatory definition of

"severe."[5] (R. 439-41.)  The ALJ found Ms. Fritz's impairments of COPD, hypothyroidism,

right-hand swelling, pre-diabetes, and history of substance abuse to be nonsevere.  (*Id*.)  She

nevertheless concluded that Ms. Fritz had the residual functional capacity (RFC) for work

> that is unskilled at SVP of one or two that is not in close proximity to coworkers
> or supervisors (meaning that the individual could not function as a member of a
> team), with minimal to no direct contact with the public.  She can lift and/or carry
> 10 pounds frequently and 20 pounds occasionally.  She can stand and/or walk for
> six hours and sit for six hours with normal breaks in an eight-hour workday.  She
> can performing pushing/pulling motions with the upper and lower extremities
> within the weight restrictions given, except that with the right (dominant) upper
> extremity, overhead, front, and/or lateral reaching is limited to occasional.

(R. 443.)  The ALJ did not define the work Ms. Fritz could perform in terms of the categories

found in 20 C.F.R. §§ 404.1567 and 416.967.[6]  At step four, the ALJ found that Ms. Fritz could

not perform any past relevant work, as this work would exceed Ms. Fritz's residual functional

capacity.  (R. 448.)  At step five, the ALJ concluded Ms. Fritz was not disabled because, based

on the testimony of the vocational expert (VE), she was capable of performing jobs that exist in

significant numbers in the national economy—such as a bakery worker and a surveillance system

monitor.  (*Id*.)

In reaching her conclusions on Ms. Fritz's residual functioning capacity, the ALJ stated

she was persuaded by the opinion of state agency (non-examining) psychology expert, Dr.

Wanstrath, as well as the opinion of the consultative physical medical examiner, Dr. Baca, and

---

[5] An impairment, or combination of impairments, is "severe" if it significantly limits an individual's
ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

[6] Based upon physical exertion requirements of the work, the regulations classify jobs as "sedentary,"
"light," "medium," "heavy," and "very heavy work."  ALJ's typically employ these categories to elicit
testimony from a VE that constitute substantial evidence that jobs exist that the claimant can perform.

assigned partial weight to the consultative psychological examiners, Dr. Benson and Ms.

Anderson, and the consultative physical examiner, Dr. Finnoff.  (R. 448.)

Specifically, the ALJ gave "substantial weight" to the portion of Dr. Finnoff's opinion

that Ms. Fritz is able to tolerate frequent sitting, standing, and walking, and has no postural

limitations.  (R. 445-46.)  The ALJ also gave "substantial weight" to the opinion of Dr. Baca that

Ms. Fritz: can lift/carry/push/pull 10 pounds frequently and 20 pounds occasionally; has postural

limitations on bending, stooping, or crouching; and has manipulative limitations in repetitive

motions with her right arm and shoulder, as well as handling objects over her head.  (R. 446.)

The ALJ noted, that although not an acceptable medical source and "therefore not entitled to any

weight as a medical opinion" (citing 20 C.F.R. §§ 404.1513(a) and 404.1527(d)), the findings of

the state agency single decision maker (SDM)[7][8] were consistent with Dr. Baca's.  Next, the ALJ

discounted the joint-opinion of Dr. Benson and Ms. Anderson, stating that "[a]lthough the

opinion's value is somewhat uncertain, since it was issued prior to alleged onset date, it is given

some limited weight."  (R. 447.)  The ALJ proceeded to reject Dr. Lester's opinion, as she found

it "not entirely consistent" with the Function Report and Pain Questionnaire Ms. Fritz completed

in November 2009 (R. 262-65, 266-67), and as it was "not wholly consistent with the objective

findings of treating providers." (R. 447) (ALJ offered only one example of such a conflicting

treating source: Dr. Wilkenson's evaluations in April 2014 (R. 659), and in July 2014 (R. 667)).

---

[7] An SDM is permitted to make initial disability determinations without requiring a medical or psychological consultants signature.  20 C.F.R. §§ 404.906(b)(2) and 416.1406(b)(2). *See also* SSA, POMS, DI 12015.100 B1 (April 11, 2011).

[8] In 2010, SDM Kristie Bradbury reviewed Ms. Fritz's medical records from Dr. Lester and Dr. Baca, and stated that Dr. Baca's opinion "carries other weight" and Dr. Lester's carries "other weight." (R. 67.) SDM Bradbury justified discounting the findings of both Drs. as their opinions relied on subjective reports of symptoms and limitations by Ms. Fritz, the totality of evidence did not support the subjective complaints, they both relied on the assessment of limitations resulting from an impairment they have not provided treatment for, and evidence provided by these Drs. reveals a limited snapshot of Ms. Fritz's functioning and is an overestimate of the severity of her limitations.  (R. 71.)  SDM Bradbury did find that Ms. Fritz had exertional limitations and manipulative limitations.  (R. 68.)

The ALJ continued to "assign[] little weight" to the Global Assessment of Functioning (GAF) scores, ranging from 49-60 in this case,[9] as a GAF score "is not an accurate longitudinal indicator of [overall functioning]," "is not standardized or based on normative data," "is a subjective," and "reflects merely an opinion on symptom severity or function from one individual at one point in time based upon claimant's self reports." (R. 447.) Finally, the ALJ gave "substantial weight" to the opinion of Dr. Wanstrath, the state agency consultant, as his opinion "is corroborated by findings in the record that show [Ms. Fritz's] mental symptoms tend to improve and stabilize with treatment," and is supported by her reported daily activities. (R. 448.)

Pursuant to 20 C.F.R. § 404.984, this ALJ decision became final on January 6, 2015 based on the Appeals Council's election not to assume jurisdiction and review this case.

## II. Legal Standard

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence, and whether she applied correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citing *Hamilton v. Sec'y of Health and Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir.1992)). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (citation omitted). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Id.* (quoting *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir.1992)). Additionally, "finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that

---

[9] Drs. Freer, Lester, and Wilkenson, as well LSCW Compono, all assigned Ms. Fritz GAF scores.

the claimant can *hold* whatever job he finds for a significant period of time." *Washington v. Shalala,* 37 F.3d 1437, 1442 (10th Cir. 1994) (citation omitted) (emphasis in original).

Crucially, "all the ALJ's required findings must be supported by substantial evidence," and she must consider all relevant medical evidence in making those findings. *Grogan*, 399 F.3d at 1262 (internal quotes and citations omitted).  Therefore, "in addition to discussing the evidence supporting [her] decision, the ALJ must discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Id.* (quoting *Clifton v. Chater,* 79 F.3d 1007, 1010 (10th Cir.1996)).  While I may not reweigh the evidence or try the issues *de novo*, I must "meticulously" examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met.  *See id.*

### III. DISCUSSION

Ms. Fritz argues the ALJ erred in according only partial weight to the acceptable medical opinions of consultative examiners Dr. Benson and Ms. Anderson, and Dr. Finnoff, as well as the opinion of a treating physician, Dr. Wilkenson.  Ms. Fritz also contends the ALJ erred in rejecting the opinion of consultative examiner Dr. Lester, and presented an incomplete representation of the opinions of consultative examiner Dr. Baca and record reviewer Dr. Wanstrath.  She further claims that "other opinions," such as those of LCSW Compono and Ms. Fritz's uncle, were not properly considered by the ALJ.  Ms. Fritz avers that these errors resulted in an improper residual functional capacity assessment that is legally deficient and not supported by substantial evidence.  Second, Ms. Fritz argues that the Commissioner did not meet her burden at step five, as the ALJ did not provide substantial evidence that a significant number of jobs exist in the national economy that she is able to perform.

While I am not permitted to reweigh the evidence, I am obligated to methodically review the numerous medical reports, observations, and treatments notes, as well as multiple hearing transcripts, which comprise the record in this case—and have also reviewed the briefs and oral arguments presented to this Court.  Having done so, I find that the ALJ's residual functional assessment is not supported by substantial evidence in the record, and in fact, substantial evidence exists to find Ms. Fritz disabled.  Furthermore, the ALJ did not properly assess Ms. Fritz's ability to perform, and to hold, a job that is available to her in the national economy.

*The ALJ's RFC Determination is Based on Selective Use of Evidence and is Controverted by Substantial Evidence, and Thus is Legally Deficient*

1.   <u>Dr. Wanstrath's Opinion</u>

When assessing an individual's capacity to work, the RFC is the "*maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."  SSR 96-8p, 1996 WL 374184, at *2 (emphasis original).  In determining if disability exists, the opinion of a treating source is generally entitled to controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2). *See also* 20 C.F.R. § 404.1527(b), (c); *Pacheco v. Colvin,* 83 F. Supp. 3d 1157, 1161 (D. Colo. 2015).  The ALJ is required to apply the following factors when she declines to give the treating source's opinion controlling weight:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing 20 C.F.R. § 416.927(c))[10];

*see also* 20 C.F.R. § 404.1527(c).[11]  In all cases, an ALJ must "give good reasons in [the] notice

of determination or decision" for the weight assigned to a treating physician's opinion.  §§

416.927(c)(2) & 404.1527(c)(2); *see also* Social Security Ruling 96–2p, 1996 WL 374188, at *5

("the notice of the determination or decision must contain specific reasons for the weight given

to the treating source's medical opinion, supported by the evidence in the case record, and must

be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator

gave to the treating source's medical opinion and the reasons for that weight."); *Doyal v.

Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003)).  "[I]f the ALJ rejects the opinion completely, he

must then give 'specific, legitimate reasons' for doing so."  *Watkins*, 350 F.3d at 1300 (internal

citation omitted).  "In choosing to reject the treating physician's assessment, an ALJ may not

make speculative inferences from medical reports and may reject a treating physician's opinion

outright only on the basis of contradictory medical evidence and *not due to his or her own

credibility judgments, speculation or lay opinion.*" *McGoffin v. Barnhart,* 288 F.3d 1248, 1252

(10th Cir. 2002) (internal citation omitted) (emphasis in original).  When deciding the weight to

assign a non-controlling medical opinion, even if the ALJ neither rejects nor unfavorably weighs

opinion, the ALJ must still consider the factors set out in sections 404.1527(c) and 416.927(c) in

a manner the enables meaningful judicial review of the decision.  *Lauxman v. Astrue*, 321

Fed.Appx 766, 769 (10th Cir. 2009).

Here, the ALJ never identified which medical experts were treating sources generally

entitled to controlling weight, and thus erred by failing to apply the required weighing factors in

---

[10] Formerly codified as § 416.927(d).
[11] Formerly codified as § 404.1527(d).

declining to give these sources such weight. [12] Furthermore, in according "substantial weight" to

non-treating physician Dr. Wanstrath, the ALJ was required under §§ 404.1527(c)(2) and

416.927(c)(2) to articulate specific factors justifying such reliance, which she also failed to do.

This omission, too, is in error, and the ALJ's justifications for according Dr. Wanstrath's opinion

substantial weight were therefore legally deficient and controverted by substantial evidence in

the record.

The ALJ's justification for the weight accorded Dr. Wanstrath's opinion was that it was

"corroborated by findings that show mental symptoms tend to improve and stabilize with

treatment" and "by the claimant's reported daily activities, which are limited but show an ability

to use public transportation, shop, do chores, prepare simple meals, and count change."  (R. 448).

The ALJ relied heavily on Dr. Wanstrath's opinion that Ms. Fritz's mental impairments

stabilize when she stays on her medications. Dr. Wanstrath references not evidence in the record

to support this assertion.  The source opinions in the record at the time of his review were those

of Dr. Lester and Dr. Baca. (R. 67.)  Dr. Lester concluded that—despite being on medication—

Ms. Fritz had marked physical and mental health impairments and that her symptoms negatively

impacted her judgment and ability to attend to tasks, concentrate, and make good decisions. (R.

372.)  He also opined that Ms. Fritz would be unable to sustain the physical demands of a

workday and did not have the mental capacity to fulfill workplace tasks.  (*Id*.)  Similarly, Dr.

Baca "strongly recommend[ed]" treatment for Ms. Fritz's mental conditions and chronic lower

---

[12] The acceptable medical sources who treated Ms. Fritz include: Drs. Freer, Campbell, Kraus, Wilkenson, and therapists at Pikes Peak Mental Health.  Non-acceptable medical sources who also treated Ms. Fritz include: clinicians at the Open Bible Medical Clinic, Ms. Compono, and the clinicians at Aspen Point.  Acceptable medical sources that performed consultative examinations of Ms. Fritz include: Drs. Benson, Finnoff, Lester, and Baca.  Acceptable medical sources only reviewing Ms. Fritz's medical records were limited to Dr. Wanstrath.

back pain -- treatment she was not currently receiving. (R. 378.) Both of these medical sources contradict Dr. Wanstrath's opinion that Fritz's symptoms improve and stabilize with treatment.

The ALJ in her opinion cited records from the Open Bible Medical Clinic and Aspen Pointe as supporting Dr. Wanstrath's opinion that Ms. Fritz's symptoms improve with treatment. (R. 448.) As previously noted, the Open Bible Medical Clinic provided no report on Ms. Fritz's treatment progress nor conclusions regarding her impairments.[13] The ALJ was therefore injecting her lay opinion, selecting a few references to typically below therapeutic level of Lithium in Ms. Fritz's blood, and an unnamed provider's vague and inconclusive note saying "bipolar—stable," to support her conclusion. (R. 408.) This same provider, moreover, reported that Ms. Fritz experienced an *increase* in her anxiety from a prescribed thyroid medication, evidence the ALJ chose to ingore. (R. 418.) The ALJ also selectively references the Aspen Pointe treatment records of Dr. Wilkenson to support the finding that Ms. Fritz's mental symptoms stabilize with treatment, ignoring Dr. Wilkenson's notes indicating that the Lamictal prescribed in July 2014 left Fritz feeling even more depressed. (R. 667.) Similarly, notes that Ms. Fritz's attention/concentration was "fair—less distractible today" does not support a finding that Ms. Fritz's mental symtopms had "stabilized," and, in fact, the actual notes referenced support the opposite conclusion in that Dr. Wilkenson states Ms. Fritz reported feeling more depressed, that she was crying for no reason, and experienced an increase in morbid thoughts. (*Id*.) Dr. Wilkenson prescribed a new medication after the referenced visit, Wellbutrin, hoping it would help Ms. Fritz's continuing mental symptoms. (*Id*.) The ALJ's reliance on records from the Open Bible Clinic and Dr. Wilkenson at Aspen Pointe to support a finding that that treatment

---

[13] The Open Bible medical record is a 20-page collection of non-conclusory notes from individual treatment sessions and prescription referrals from multiple providers at the Clinic, some of which are not even signed by an individual provider, which span a 14-month time period.

"stabilizes" Ms. Fritz's mental impairments is unsupported by substantial evidence and is therefore erroneous.

Furthermore, the ALJ failed to consider evidence in the record affirmatively demonstrating that Ms. Fritz's mental symptoms did *not* stabilize with treatment—a failure that casts doubt on her RFC determination. For example, Dr. Freer -- who doubted Ms. Fritz's bipolar disorder diagnosis but not the existence of mental impairments generally -- switched Ms. Fritz from Lithium to Zoloft, but this new medication made Ms. Fritz feel more manic.  (R. 344.)  Ms. Fritz's subsequent medical provider, Dr. Campbell, was aware of Dr. Freer's doubts but maintained a bipolar disorder diagnosis, switching Ms. Fritz back to Lithium (R. 342, 347). Ms. Fritz's Opening Brief also makes a crucial point on this issue—even if there was a stabilization of Ms. Fritz's bipolar disorder from her Lamictal prescription, a particular mood disorder is not the only psychological barrier to work that Ms. Fritz has.  (Pl.'s Br. 12.) Even the ALJ found Ms. Fritz to have a "severe" anxiety disorder (R. 439), and her failure to recognize other symptoms and impairments while concluding others are stabilized with treatment is a prime example of the omissions and elisions that populate the ALJ's decision. In 2014, Ms. Compono's clinical observations found that Ms. Fritz was still suffering serious mental symptoms with regard to her bipolar disorder and anxiety disorder, concluding that because of these symptoms, Ms. Fritz "would not be able to function in a work environment."  (R. 677.)  During the most recent ALJ hearing, Ms. Fritz reported new treatments have increased her anxiety (R. 480-81), consistent with Ms. Compono's opinion.

The contention that Dr. Wanstrath's opinion is supported by Ms. Fritz's "ability to use public transportation, shop, do chores, prepare simple meals, and count change" is also legally deficient and contrary to substantial evidence in the record. The "sporadic performance of

[household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity." *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) (citation omitted) (alteration in original). The ALJ's inference of nondisability or functionality from Ms. Fritz's daily activities, moreover, is inconsistent with substantial evidence in the record. The Function Report (R. 266-73) Ms. Fritz completed as part of her application for DIB and SSI, for example, includes telling caveats to each of the daily activities she is deemed able to perform: She uses the bus on occasion, but says her uncle fears she will "freak out or something" when doing so (R. 269); she shops for groceries three to four times a month, but it takes her a "[l]ong time if I dilly dally and read labels, and la la around, trying to decide takes a <u>LONG</u> time (*id.*)(emphasis original); and she can do two loads of laundry a month, but it takes her all day and wears her out. (R. 268.) Ms. Fritz reports that what encourages her to do laundry is when she runs out of socks and "stuff starts smelling." (*Id.*) She "can't wipe or scrub [around the house because] continuous motion cause cramps in hand" (*id.*), nor can she push a vacuum (R. 269). The simple meals that Ms. Fritz reports cooking include "soup, [sandwiches], crock pot, Ramen, grill cheese, fruit is handy [such as] Bananas, canned peaches, canned soup," and she expresses difficulty even preparing these meals. (R. 268.)

The ALJ chose to rely on the minimal portions of this Functional Report that might support a finding of nondisability, while ignoring significant portions that would justify finding disability. In this Report, Ms. Fritz details significant problems she has being able to perform daily living activities, including cleaning herself, changing her clothes, sleeping for more than four hours at a time, and completing most household chores. (R. 267-70). She reports severe anxiety at going out in public, and would not make her Doctor's appointments if it were not for her uncle's pressure. (R. 270.) She states that she no longer engages in any of her pre-disability

hobbies, nor has any social or romantic life beyond contact with her uncle.  (R. 269, 271.)  The

ALJ points out that Ms. Fritz can count change, but ignores her statement that she cannot pay

bills, handle a savings account, or use a checkbook/money orders, explaining in part that she

"[c]an't handle/fact [these activities, as they are] too hard to hand[le] at this time."  (R. 269.)

Further ignored by the ALJ are reports of Ms. Fritz's extensive deficiencies in her abilities,

including that she cannot: get up from squatting, reach, kneel, complete tasks, and that walking

exhausts her, sitting causes numbness, and she would rather not engage with other people.  (*Id*.)

She states that she does not recognize things she knows, forgets words, has to rest after a block

of walking, cannot focus her attention for long or complete activities she starts.  (*Id*.)

Additionally, Ms. Fritz describes that she does not handle stress, reacting by either shutting down

or exploding, and that she "catastrophyally" handles changes in routine.  (R. 272.)  She expresses

increases in her paranoia, fear, and has seen things that are not there.  (*Id*.)

In a separate error, the ALJ employs Dr. Wanstrath's opinion to support minimal

limitations that are *not* in accord with what he says. For example, Dr. Wanstrath concluded Ms.

Fritz had moderate limitations in her understanding and memory, sustained concentration and

persistence, and social functioning.  Specifically, he found she was moderately limited in her

ability to interact appropriately with the general public, to accept instructions and respond

appropriately to criticism from supervisors, to get along with coworker or peers without

distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior

and to adhere to basic standards of neatness and cleanliness.  (R. 70, 85.) Dr. Wanstrath's

opinion is not specifically referenced in the equivalent impairment listing section of her decision

(R. 441-42), and crucially, it is supplanted by the ALJ's lay opinion during Ms. Fritz residual

functional capacity assessment (R. 443-48).  Instead of relying on the complete findings, or exact

language, of Dr. Wanstrath, the ALJ translates the limitations described in his opinion to "meaning that [Ms. Fritz] could not function as a member of a team."  (R. 443, 483.)[14]

2.    The ALJ Ignored Consistently Low GAF Scores.

In her opinion, the ALJ rejected the GAF scores assigned to Ms. Fritz by Drs. Freer, Lester, and Wilkenson, as well LSCW Compono.  The only justification provided for this was the ALJ's lay view that GAF scores are "not standardized or based on normative data."  (R. 447)("[A GAF score] is subjective and reflects merely an opinion on symptom severity or functioning from one individual at one point in time based upon a claimant's self reports.")[15] The ALJ therefore declined to address any of the scores assigned Ms. Fritz directly or individually.

When a GAF score is "not essential to [an] RFC determination, inadequate to establish disability, and contradicted by an opinion from an acceptable medical source," it is not required for an ALJ to specifically discuss conflicting GAF scores given a claimant in disability proceedings. *Holcomb v. Astrue*, 389 Fed.Appx 757, 760 (10th Cir. 2010).  Here, four different treating professionals,[16] at one time or another, assigned Ms. Fritz a GAF score of 50.  Although a low GAF score, standing alone, does not necessarily substantiate a severe impairment, a score of 50 or less is evidence that a claimant might be unable to sustain employment, and should not be ignored by the ALJ.  *Lee v. Barnhart*, 117 Fed.Appx. 674, 678 (2004).  Additionally, the

---

[14] The first mention in the record of the "member of a team" limitation is during the ALJ's oral hearing, and the Commissioner conceded at oral argument it was not found in any medical expert's opinion.

[15] Although the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* issued May 27, 2013, abandoned the GAF scale in favor of standardized assessments for symptom severity, diagnostic severity, and disability (see *Diagnostic and Statistical Manual of Mental Disorders V* (DSM–V) 16 (5th ed.2013)), at the time of Ms. Fritz's assessment by all sources in the record, the GAF scale was used to report a clinician's judgment of the patient's overall level of functioning on a scale of 1 to 100 (see *Diagnostic and Statistical Manual of Mental Disorders IV* (DSM–IV) 31–34 (4th ed.2000)).

[16] Dr. Feer a score of 50-55, Dr. Lester a score of 50, LSCW Compono a score of 50, and Dr. Wilkenson a score of 50.

scores assigned by treating acceptable medical sources—Dr. Freer and Dr. Wilkenson—should have been directly addressed, and the ALJ was obligated to justify her decision to not give them substantial or controlling weight. *Langley*, 373 F.3d at 1121. Such unsupported rejection of these GAF scores highlights the flaw in the logic of ALJ's proffered reason for blanket rejection of GAF scores, i.e., that they are unreliable.

The ALJ's conclusion that all GAF scores are inaccurate and so subjective to render them meaningless subverts "[t]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability." *Morales v. Apfel*, 225 F.3d 310, 319 (3rd Cir. 2000). Moreover, the acceptable treating sources Drs. Freer and Dr. Wilkenson treated Ms. Fritz over time, and employed medically acceptable clinical methods of diagnosis as well as justifications for the scores assigned. Additionally, the Tenth Circuit has found even examining non-acceptable medical sources to be highly probative. In *Groberg v. Astrue*, 415 F. App'x 65, 70 (10th Cir. 2011) (unpublished), a GAF score of 50 was given to the claimant by an examining licensed clinical social worker, who was a "non-acceptable medical source. A score of 50 lies within the 41-to-50 range, the Court wrote, indicating "'serious symptoms or serious impairment in social, occupational, or school functioning, such as inability to keep a job.'" *Id.* at 70-71 (quoting *Pisciotta v. Astrue,* 500 F.3d 1074, 1076 n. 1 (10th Cir.2007) (quotation and alterations omitted). In this case, Dr. Lester and LSCW Compono assigned Ms. Fritz a GAF score of 50. The ALJ's wholesale rejection of these scores controverts Tenth Circuit caselaw, and, furthermore, cannot constitute substantial evidence that Ms. Fritz could find and sustain employment. *See Kelly v. Astrue,* 471 Fed. Appx. 674, 677 (9th Cir. 2012) (ALJ commits error when he rejects examining medical sources' GAF

scores absent "specific and legitimate reasons that are supported by substantial evidence in the record").

3.    The ALJ Improperly Discounted and Rejected the Opinions of Dr. Benson and Ms. Anderson, and LSCW Compono.

While only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, use of information from "other sources," both medical and non-medical, may provide evidence to show the severity of an impairment and how it affects the claimant's ability to work. *Frantz v. Astrue*, 509 F.3d 1299, 1301-02 (10th Cir. 2007). The Social Security Administration has explained that the factors required to evaluate opinions of acceptable medical sources, §§ 404.1527(c) and 416.927(c), apply equally to all sources— acceptable medical and non-medical sources alike. *Id.* at 1302 (citing SSR 06-03p at *1). An ALJ commits error when he highlights evidence favorable to a finding of nondisability from a non-acceptable medical source, but then ignores or fails to discuss the weight given to the findings from this same source that would support a finding of disability. *Id.*

In addition to disregarding the GAF scores assigned by Drs. Freer, Lester, and Wilkenson, as well LSCW Compono, I find error in the justification of the weight given to Dr. Benson and Ms. Anderson's examination, as well as the treatment notes and reports from Ms. Compono. The ALJ states that she gave "some limited weight" to the acceptable medical opinion of Dr. Benson and Ms. Anderson—but what statements and what weight is unclear from the ALJ's decision. (R. 446-47.)

Dr. Benson and Ms. Anderson concluded that due to Ms. Fritz's mental and physical impairments, her limitations would present a significant barrier to finding and sustaining employment. (R. 322-25.) Notably, these experts opined that Ms. Fritz's mental impairments required that she work in verbally oriented and well-structured jobs, without unpredictable

contact with the general public, that she could only work with others with whom she felt comfortable and who were willing to work with her—concluding she would likely have interpersonal and emotional problems in any job.  (R. 325.)  Such limitations were translated by the ALJ into the restriction that Ms. Fritz "could not function as a member of the team" (R. 443, 491), a lay-interpretation of expert opinions that is inconsistent with the evidence in the record. The ALJ states that this medical opinion "is not controverted by a treating provider," (R. 446) which is true and highlights her error—all treating providers have concluded that Ms. Fritz has serious conditions that would impair her ability to find and sustain employment.  The ALJ proceeds to characterize Dr. Benson and Ms. Anderson's opinion as supporting the conclusion that Ms. Fritz is "stable with treatment" (R. 446) and that her daily activities—such as using public transportation, shopping, and periodically dating (R. 447)—support the RFC assessment.

The evidence alleged to support the stabilization agreement has already been addressed above, and this claim is controverted by substantial evidence in the record.  Similarly controverted are the claims about her use of public transportation and ability to grocery shop, and the ALJ fails to address Ms. Fritz's claims that going out in public causes her panic attacks and sleepless nights that make her unable to function for several days (R. 48-53.)  The ALJ's claim that Ms. Fritz has dated periodically is flimsily supported by a general reference to the forty-eight page treatment records of Ms. Compono at Franciscan Community Counseling (R. 675-732), and thus is not specific enough to constitute substantial evidence, a recurring issue further discussed below.  More importantly, the claim about her dating is directly controverted by the record.  (*E.g.* R. 53, Ms. Fritz stating "[b]ut as far like if going on a date and like, not like anyone's going to ask me, but I, I couldn't do it.").

The final justification offered for the apparent discounting of the substantive portion of the opinion of Dr. Benson and Ms. Anderson is that it was made before Ms. Fritz's alleged onset date. Discounting acceptable medical opinions for such a reason is error. *See e.g. Hamlin v. Barnhart,* 365 F.3d 1208, 1223 n.15 (10th Cir. 2004) (finding that all medical reports are part of the case record and should be considered by the ALJ) (citing 42 U.S.C. § 423(d)(5)(B) ("the Commissioner ... shall consider all evidence available in [an] individuals' case record ..."); and 20 C.F.R. § 404.1527(c) (every medical source received by the Commission will be considered in evaluating a disability claim).

Additionally -- and the Commissioner admitted as much during oral argument -- the ALJ erred in failing to address Ms. Compono's disability findings. Although a non-acceptable medical source,[17] Ms. Compono's opinions may be used to show the severity of an impairment and how it affects the claimant's work, and the weight given these opinions should be evaluated using the factors set out in §§ 404.1527(c) and 416.927(c). *Frantz,* 509 F.3d at 1301-02; *see also Lauxman v. Astrue*, 321 Fed.Appx 766, 769 (10th Cir. 2009) ("[A]n ALJ must consider the opinion of every medical source and provide specific, legitimate reasons for rejecting it."). Additionally, in her opinion, the ALJ relies on the findings of Ms. Compono when attempting to support a finding of nondisability, but then ignores the portion of this opinion which would support a finding disability and fails to discuss the weight given these portions of Ms. Compono's opinion. *Frantz*, 590 F.3d at 1302. It is worth recounting that Ms. Compono summarized her treatment of Ms. Fritz in two separate reports, both of which indicated the severity of Ms. Fritz's impairments and their effect on her ability to function socially, emotionally, and occupationally. (R. 430-32, 675-77.)

---

[17] *See* SSR 06-03P ("Medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists").

4.    Failure to Consider John Staunton's Letter.

The ALJ failed to address the testimony of Ms. Fritz's uncle, John Staunton, in the form

of a letter submitted to the ALJ and dated February 14, 2011.  (R. 292-94.)  Mr. Staunton has

opened his home to Ms. Fritz since she moved to Colorado in 2006, and by all accounts in the

record, is the only person standing between Ms. Fritz and homelessness. Ms. Staunton

encourages her to seek treatment and to take her medications, and appears to be the only form of

social and familial support Ms. Fritz has.  He has the longest, most extensive and comprehensive

exposure to Ms. Fritz of any source in the record.  In his letter, Staunton confirms that Ms. Fritz

was homeless prior to moving in with him, and that their family has an extensive history of

bipolar disorder and he himself has been prescribed Lithium since 1984.  (R. 292.)  His letter

speaks to the limited efficacy of Ms. Fritz's medication regimen, as her treatment with Lithium

> controls, to a degree, the high anxiety and excitability on one day, to paranoid
> scenarios of grand government conspiracies on the next day.  It's an emotional
> roller coaster ride, which I know well.  My niece is very reclusive and does not
> want to socialize with people.  It troubles me that Beth believes she has met Jesus
> and says he is walking the earth.

(*Id.*)  Mr. Staunton continues to detail how bipolar disorder has affected members of their family

around forty to fifty years of age, including himself, two of his sisters (both of which required

hospitalization), and two of his nephews.  (R. 292-93.)  This is the clearest family history of

bipolar disorder provided in the record, and corroborates Ms. Fritz's reported symptoms and

their severity.  The ALJ is obligated to give careful consideration to the entire record and

perform a complete review of the evidence.  I find the ALJ's failure to reference this letter, in

any manner, in her decision supports an inference that she did not consider it.  While an ALJ is

not required to make specific written findings on each witness' credibility, that rule applies "only

if the 'the written decision reflects that the ALJ considered the testimony.'"  *Blea*, 466 F.3d at

915. This evidence was clearly relevant, and at least the familial history was uncontroverted and significantly probative, and thus the ALJ was under an obligation to discuss and failing to do so means the decision is not based on substantial evidence. *Grogan*, at 1262.

5.    The ALJ Made Additional Errors that Preclude Her Decision from Being Supported By Substantial evidence.

First, the ALJ failed to conduct a proper pain analysis of any of Ms. Fritz's physical and mental impairments. The lack of available objective medical evidence that substantiates a claimant's statements about the intensity and persistence of pain, and its effect on her ability to work, is not alone a valid basis for rejecting these statements. §§ 416.929(c)(2) and 404.1429(c)(2); *see also Luna v. Bowen*, 834 F.2d 161, 165 (10th Cir. 1987) ("If objective medical evidence must establish that severe pain exists, subjective testimony serves no purpose at all."). The ALJ errs when she fails to perform a proper pain analysis or merely recites the factors that are required to be address without connecting his conclusions to the evidence in the record. *Carpenter v. Astrue*, 537 F.3d 1264, 1268 (10th Cir. 2008). Objective medical evidence of either "physical and mental impairments can support a disability based on pain," and a claimant must establish only a loose nexus between the impairment and the pain alleged. *Luna*, 834 F.2 at 162, 164. The absence of any pain analysis by the ALJ is particularly troubling in this case, as the ALJ did determine that Ms. Fritz has severe and pain-inducing impairments resulting from her degenerative disc disease of the lumbar spine and cervical stenosis with thoracic outlet syndrome. (R. 439.)

Second, the ALJ relies on citations to multi-page exhibits without pinpoint citations to specific pages. The record in this case is 807 pages long and throughout the RFC discussion and the written findings generally, the ALJ provides only general references to exhibits in this case—many of which themselves are lengthy and include various forms of medical records. Such

general citations do not constitute substantial evidence in support of the ALJ's decision, and ALJ's in this district have received fair notice of this concern.  *See e.g. Romo v. Colvin,* 83 F. Supp. 3d 1116, 1120 n.4 (D. Colo. 2015) (listing the numerous times since 2014 Judge Blackburn has called the Commissioner's and ALJ's attention to global references failing to establish substantial evidence); *Brown v. Colvin*, 82 F. Supp. 3d 1274, 1279 n.5 (D. Colo. 2015) ("The Commissioner should now have fair notice of this court's position that, in general, such global references will not constitute substantial evidence in support the ALJ's decision and thus will warrant remand."); *see also Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-80 (6th Cir. 2013) (even non-acceptable medical source opinions must be considered, and if uncontroverted but rejected or given little weight, the ALJ's reasoning must be supported by specific references to the record). *See also Ausbun v. Colvin,* No. 16-cv-810-JLK, slip op. at 11, n. 7 (D. Colo. Nov. 8, 2016).

*The Commissioner Has Failed to Meet Step Five Burden*

At step five of the five-step protocol, "[t]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the [Commissioner]'s decision." *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991).  Additionally, any hypothetical posed to the vocational expert must include all of claimant's impairments recognized by the ALJ, including both severe and nonsevere impairments, as well as "mild" or "moderate" limitations. *Widerholt v. Barnhart*, 121 Fed.Appx. 833, 839 (10th Cir. 2005). When the ALJ fails to include each of these restrictions in the hypothetical question posed to the vocational expert, testimony elicited by this hypothetical question "cannot constitute substantial evidence to support the Commissioner's decision." *Id.* (internal citation and quotation marks omitted).

33

The hypothetical posed to the vocational expert (VE) was insufficiently precise and inadequately took into account Ms. Fritz's mental and physical restrictions (R. 483), and thus cannot constitute substantial evidence to support the ALJ's finding that Ms. Fritz can perform other work.  For the reasons discussed above, the ALJ's RFC assessment is not supported by substantial evidence.  Accordingly, the ALJ's decision at step five is defective as it did not properly assess Ms. Fritz's impairments.

Even if it is presumed that Ms. Fritz's RFC determination was supported by substantial evidence, nevertheless the ALJ makes additional errors at step five.  Given the impairments that the ALJ did find, these were not precisely related to the vocational expert.  First, the hypothetical posed makes no mention of postural limitations.  *Id.* (neither does the RFC determination in ALJ's opinion, R. 443).  The ALJ gave "substantial weight" to the "[un]controverted" opinion of Dr. Baca, and it his findings that comprise the ALJ's statement of Ms. Fritz's RFC. (R. 446). Yet, Dr. Baca found that Ms. Fritz has postural limitations of "no bending, stooping, crouching greater than five times an hour or as tolerated by the patient." (R. 378.) These postural limitations were recognized by the ALJ (R. 446), but never distinguished as controverted or unreliable in her opinion.  Thus, the ALJ erred in omitting these from the hypothetical question posed to the vocational expert. (R. 483.) Second, the ALJ's hypothetical did not precisely relate *all* of the impairments the ALJ found to be severe, specifically Ms. Fritz's cervical stenosis with thoracic outlet syndrome nor her anxiety disorder. Additionally, the ALJ failed to include *any* of the mild restrictions in Ms. Fritz's daily living or moderate difficulties in her social functioning or concentration, persistence or pace. (R. 442.) As was found in *Widerholt*, 121 Fed.Appx. at 839, the ALJ's inclusion here of the phrase "work that is unskilled with an SVP of one or two" does not adequately incorporate the ALJ's more specific findings on Ms. Fritz's mental and

physical impairments (R. 483), and thus the testimony elicited is not substantial evidence to support the ALJ's decision.

## IV. The Appropriate Remedy

Given the findings of error enumerated above, I now address the question of whether a further remand to the agency is warranted or whether, given the tortuous path this claimant's disability proceedings have trod, to simply reverse and award benefits.  *See* 42 U.S.C. § 405(g) ("The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the case for a rehearing.")  Outright reversal is appropriate when "additional fact finding would serve no useful purpose" and "the record fully supports a determination that [the claimant] is disabled as a matter of law and is entitled to the benefits for which he applied." *Sorenson v. Bowen*, 888 F.2d 706, 713 (10th Cir. 1989).  In deciding on the appropriate remedy, I should consider both "the length of time the matter has been pending and whether or not 'given the available evidence, remand for additional fact-finding would serve [any] useful purpose but would merely delay the receipt of benefits.' " *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir.2006) (alteration in original) (quoting *Harris v. Sec'y of Health & Human Servs.*, 821 F.2d 541, 545 (10th Cir.1987)).

I have reviewed the record thoroughly, the issues have been fully briefed by the parties, and oral arguments were presented to this Court.  The record in this case fully supports a determination that Ms. Fritz cannot hold, and sustain, full-time employment due to her mental and physical impairments.  The only evidence that would counter this conclusion is that of the consulting state psychologist—but this opinion is not supported by the medical evidence that he reviewed in making it, and was incorrectly represented by the ALJ in her decision.  Ms. Fritz has

been treated by at least eight health professionals, and examined by at least four acceptable medical sources.  The evidence collected from these individuals is inconsistent with the nondisability determination made by the ALJ, and more aptly, substantially supports a finding that Ms. Fritz is unable to work.  Accordingly, I find there is no need for further proceedings other than to remand for an award of benefits.  *Sisco v. U.S. Dep't of Health & Human Servs*., 10 F.3d 739, 745-46 (10th Cir. 1993) (finding award appropriate when disability is supported by substantial evidence in the record and claim has already been thoroughly adjudicated); *see also Groberg v. Astrue*, 415 Fed.Appx. 65, 73 (2011) (finding that after five years since filing the claim, when nothing further would be gained from further delaying proceedings and the medical evidence pointed to disabling mental impairments, reversal and remand to Commissioner an immediate award of benefits was appropriate).  Ms. Fritz has been litigating her denial of benefits for most of the past eight years. There have been three separate ALJ decisions, multiple evidentiary hearings, and at least one previous remand. "The [Commissioner] is not entitled to adjudicate a case '*ad infinitum* until it . . . gathers evidence to support its conclusion.'"  *Id*. at 746 (internal citation omitted). I REVERSE the decision of the Commissioner, and REMAND for an immediate award of benefits to Plaintiff.

Dated this 18th day of January, 2017.

John L. Kane
SENIOR U.S. DISTRICT JUDGE